Good morning, Your Honors. I am Julia Olson, Counsel for Plaintiffs' Appellants, Friends of Yosemite Valley, and Mayor Poston's for Environmentally Responsible Growth. I would like to reserve five minutes for rebuttal, if I may. Fine. Thank you. I would like to address three points this morning. First, the Comprehensive Management Plan and EIS prepared for the Merced River are illegal because decisions and conclusions in those documents are not based on or supported by data. Second, the plan fails to address user capacity as required by the Act and Secretarial Guidelines. Third, the river area boundaries set for the El Pertel segment of the river are based on development plans and not on river protection. Before I address these issues, I would like to emphasize that this case is about legal error. The agency incorrectly interpreted the Act and the requirements of NEPA, and the District Court improperly deferred to the agency's interpretations of the Wild and Scenic Rivers Act. In order to ensure that wild and scenic rivers are managed appropriately and with foresight, Congress requires agencies to prepare plans that are comprehensive, and it gives agencies three full years from the time of designation to complete management plans. Here, after waiting 12 years to prepare a plan, and only doing so after being ordered to do so by a court, the Park Service prepared a draft plan for the river and issued the draft plan within only six months of the court's order requiring the plan. That short time frame did not allow the agency time to prepare and collect data that would be essential for preparing a plan that is protective of river values. In fact, the Park Service ignored its own experts' advice and the advice of its consultants that stated during the planning process that the lack of data hindered the ability of the Park Service to prepare a plan that would be protective of river values. Everyone knew that they needed to take more time and collect data. It was one of the number one comments made by the public in response to the draft plan. But the Park Service did not take time to conduct surveys of the river's outstandingly remarkable values. It did not locate and map special features such as wetlands or important habitats  They have adopted, apparently, this process, right, of getting at those issues. The VERP process, right? Yes, the Visitor Experience Research Project. Now, why isn't that sufficient to meet their statutory obligation? Because the data that needs to be collected needs to be collected before the plan is adopted. And the VERP process is actually a framework for collecting data in the future over a five year period. That data needed to be the predicate to a legal plan and collecting the data after the fact does not meet its duty under either the Wild and Scenic Rivers Act or NEPA. The fundamental reason for this is that there are ongoing impacts to the river area, primarily visitor use. There are roughly four million people who enter the river corridor in Yosemite Valley each year. And those impacts are significant and are noted in the record. Are the numbers of people who enter Yosemite each year increasing? Is that a documented trend or not? Yes, Your Honor. In fact, I believe in 1975 visitation was at about 2.5 million. And by 1996 it was at a little over 4 million. And I expect visitation to continue to increase based on the fact that the population in California continues to increase. Now, was there ever any measurement as to the total capacity for usage of the river? Was there a measurement as to that? So that if you said we had 4 million last year, you'd say, well, that's about it. We can only have 4 million. So we have to limit to 5 million next year. No, the Park Service never established a quantity of use that the river area could sustain without degradation to its outstandingly remarkable values. Even though the secretarial guidelines specifically require comprehensive management plans to state the quantity of use and the types of use that the river area can sustain. What do you think it means by quantity? Do you mean in number of persons? Yes, it's a numeric figure that may vary in different segments of the river, but they still need to get to a maximum quantity of use for the river area. How does one do that? How does one decide what is the maximum quantity of use? I assume there's different uses in different areas of the river. How do you calculate that? I think the Park Service needs to collect data on where the outstandingly remarkable values throughout the river area, where the wetlands, where the meadows, where the sensitive habitats, and determine how much use it has had, what's the baseline of use in the park, where are the users going, and how can we set a maximum quantity that will not only protect those river values, but will enhance them. It's one of the important requirements of this statute that values be enhanced, which may mean in some cases restoration. But again, why isn't VRP accomplishing that? VRP does not accomplish that because VRP only, it's a framework for a process that will allow the agency to collect data, which again should have been collected before the plan was issued. But ultimately what VRP does is the agency will collect data, it will do monitoring to see what's happening with the resource, but it will never establish what the maximum quantity of use is. So the way the Park Service intends to address resource degradation is through monitoring. It will monitor the resource, and if it sees degradation occurring, it may take management actions to address that. But the purpose of this plan is to ensure that degradation does not occur in the first instance, which is why they need to establish what's the maximum quantity of use we can have, consistent with all of our requirements, this river and the resource. And that's why VRP is illegal. It's forward looking, it never gets to the maximum quantity of use as required by the Act and the guidelines, and it's an iterative process for management that doesn't take preventive steps. Well, the Interior Department says that user capacity is addressed, just not quantitatively, they've addressed it qualitatively. And that, I assume, is what you're saying, you agree that's what VRP does and that that is insufficient. Actually, VRP doesn't even address user capacity qualitatively in this management plan, because it doesn't make any decisions. One of the tools that the VRP process will use in the standards for degradation. And this plan does not set a single indicator for when the resource is being degraded. So this plan does not address user capacity. How, I'm sure you've seen other comprehensive management plans, how does this compare with others in terms of the amount of data calculated, or compiled in advance of user capacity? In terms of the enactment of the plan? This plan has far less data about outstandingly remarkable values and about what's happening in the river than other management plans. And I think this court can look to both of the Ondevie Singleton and Ondevie Green cases in the District of Oregon, where the court in the Singleton case stated that the agency was authorizing livestock use without looking at how that use really impacted the river on the ground. And noted that the lack of data was one of the reasons why the plan was illegal. In Green, the District Court of Oregon also noted that data was a really essential part of the planning process. And we cited in our plan the hydrological system of the river on gravel banks and spawning habitat and other really specific features of the river area. Well now, suppose we were to agree with you and we said this is an illegal plan. Wouldn't the agency have a plan trying to collect this data and come up with user capacity and come up with baseline data? And then you would have them doing that without a plan in place at all. What we ask this court to do is issue a declaratory judgment that they have violated the act and remand to the District Court for further proceedings related to what kind of injunctive relief would be necessary. And that would at least take a year to collect data and perhaps complete a plan within two years of a court's order. But I think the issue of what kind of injunctive relief would be necessary would be an issue for the District Court to resolve. But I do think it's possible for them to collect data in a timely manner and for there to be an injunction in place that protects the river in the interim period. I would like to say one more thing about user capacity. Again, we think that this court can interpret the plain meaning of the act. But if this court chooses to defer to an agency interpretation, it should defer to the 1982 Secretarial Guidelines, which explicitly states that the plan shall state the kinds of amounts of public use which the river area can sustain. And this court in Wilderness Society v. Tyrell in 1990... Now, again, when you say amounts in the Guidelines, the Secretarial Guidelines, it means, for instance, like a number of visitor days or something like that, some kind of a numerical set figure, right? Yes. Do you think the Guidelines require... Yes, the Guidelines require a quantity or an amount, and both of those terms are always used in a numeric, with a numeric figure. If you look at other courts that have been, other, excuse me, cases that have been decided by this court, such as the, excuse my pronunciation, Masaya Yeseva v. Hale case at page 1379, this court, in looking at the term carrying capacity, sua sponte defined carrying capacity as an amount of cattle grazing that the land could sustain without adverse impact, and it looked at a specific numeric figure for carrying capacity. Well, they usually, DLM or Forest Service will break it down into units, don't they? So many units. Yes. I think the Park Service would have to look at the numbers coming in and whether they could best limit those numbers by per person or by car or diesel bus entering the park, the numbers of people coming in those vehicles. It's something that they need to analyze and figure out. They're doing that, aren't they? That is, they're already dealing with the problem on a kind of an ad hoc, day-by-day basis. They're already stopping some traffic, putting people on buses and so on. There's no evidence in this record that they are doing anything to limit use. This plan authorizes unlimited quantities of use of the park. And this plan specifically needs to state how they can limit use to protect the river area. Well, what you're saying is, you know, all these other kinds of limitations, maybe, you know, visitors into the park or trail headquarters, all that stuff is extraneous to the requirements of the of the Wild and Enchanted Rivers Act, right? That's correct. There's no limitation by the Park Service that focuses on the values of the river. That's correct. Park Service never made that determination. And I'd like to briefly touch on the El Patel boundaries that were established by the Park Service in the plan. Again, this is another issue where the Park Service misinterpreted the statutory requirement. When Congress designated the Merced River, it explicitly stated in the legislation that designated the river that the Park Service's general management plan for Yosemite should be amended and that no development or use of any park lands should occur that would be inconsistent with the river's designation under the Act. In addition, the Act explicitly states in Section 1283 that where there is a conflict between the Act and laws governing park lands, the more restrictive provision should apply. And here, the agency decided the boundaries in the El Patel segment of the river based on its desire to develop outside of the boundaries. And it took the El Patel Administrative Site legislation from 1958 and balanced that with the Wild and Scenic Rivers Act mandates, which was an inappropriate decision on its part and an inappropriate interpretation of the law. In addition, the Park Service's own experts stated that the boundaries would not protect the outstandingly remarkable values in El Patel, including cultural resources. Some of the oldest cultural resources in Yosemite are located in El Patel outside of the boundaries. Further, the Forest Service and the Bureau of Land Management, the sister agencies of the Park Service, stated that the Park Service's boundary selection for El Patel was not protective of river values. I see that I'm at four minutes, so I'd like to reserve the rest of my time. That's fine. May it please the Court, I'm David Shilton from the Department of Justice, representing the Department of the Solicitor's Office, Department of Interior. I plan to address the issue of user capacities and then the issue of adequacy of data and then the El Patel boundary issue. With respect to user capacity, what Section 1274 D.1 requires is that a comprehensive management plan, quote, shall address user capacities. That's a very general directive. Congress didn't say that the management plan must enact numerical limits. It just says that But it's been further interpreted by the secretarial guidelines, right? It has, and the secretarial guidelines, there's nowhere in the guidelines that says a management plan has to It says that you must address quantities and nature of use. More specific than that, isn't it? Well, the three instances that the plaintiffs have mentioned in their brief, the first one is the guidelines say that management plans will state, quote, the kinds and amounts of public use which the river can sustain without impact to the values for which it was built. Right. Now, where in the CMP does it state or define or describe the kind and amount of public use which the area can sustain without impact to its OBRs? In a couple of places. The first place is in the management zoning that's set. That restricts the amount. How does that restrict the amount, though? By restricting the types of facilities that are present there. If you don't have trails or comfort stations or lodgings or camping, the amount of use is going to go down. You're saying you're just addressing the kind, the type. You're not addressing the amount. Well, it addresses the level of use. You're saying if you address the kind or the type, that also will take care of the amount? Well, if you restrict the facilities, it will take care of the level of use or at least will start the process and then when you have the visitor experience resource protection process monitoring it, you can adjust the management zoning so that if there are any problems that develop, you can deal with it. I think the problem I have on this question, because you could, I don't know, if I have to think further on quantity versus other ways of addressing it, but don't you have to know what the capacity is before you can address it or deal with it, accepting your definition of it? Don't you have to know what that capacity is? Yes, and I think the Park Service knows that, has a good handle. It's got 100 years of data on Yosemite Valley and what these river areas can accept in terms of usage. What is that capacity? Well, it doesn't state it in terms of numbers of visitors because that's a simplistic way to do it. The Park Service has found it's very unhelpful. Back in 1980 in the general management plan, the Park Service actually came up with a number for daily visitors and it's found that that is not at all helpful because if you set a number at say 15,000 per day, you have an enormous variety of places in the park that those may visit and they may all end up at Yosemite Falls and you'll have damage there and the rest of the park may be undamaged. So the Park Service concluded, I think quite reasonably, that the better approach is to look at the particular areas and determine what level of use is appropriate for this area based on what we know about its sensitivity so that if there is presently a campground that's next to the river and we see that there's some damage there, we can zone that so that camping use is no longer appropriate and then we'll monitor it to make sure that that continues to be the case. One of the problems here was simply set up by the fact that the Park Service chose the widest possible boundary through Yosemite Valley under the Wild and Scenic Rivers Act. The boundaries of the river corridor are a quarter mile on each side of the river. By doing that, they've included the Iwani Hotel, parts of the lodge, picnic areas, campgrounds, Bridal Veil Falls parking lot, and so to set numbers of visitors that could visit each of those areas, you would end up with, I don't know, kind of a Disneyland sort of situation with cordons and so forth. It just doesn't work to set numbers, so the Park Service has adopted these management zones, which will affect the amount of usage of these areas, and then the Visitor Experience Resource Center, which is a resource protection process, will set specific indicators such as amount of bare ground along a bank of the river. If it gets above a certain percentage, then we'll have to close that area. Okay, assuming one can see that VERP over time would work as a measurement tool, you have stated that it's an iterative process and it's just going to go on and on and on. And isn't your obligation to have set standards by three years? And you have a five-year horizon for the VERP, and, you know, probably given the way this is going on, a more indefinite determination. So aren't you, shouldn't you have adopted some indicators or standards at the outset, perhaps using VERP as a measurement tool, but still have some limits, some capacity limits at the outset? Because otherwise, how did you meet your three-year requirement? Well, the three-year requirement is for the plan, and according to the statute, the plan is to address these four topics. It shall address resource protection, but it doesn't say that that must be done by immediately having standards and indicators. So here, the Park Service addresses resource protection by having these management zones, by having this river protection overlay zone 150 feet on either side of the river, which is very restrictive as to what... Pepper El Portal. Well, El Portal is an area with a different character than the park. It's always been the area that Congress designated for putting the utilities, the sewage plant, the administrative offices, and so it has a different character also geographically. It's different in that it's down the canyon where the river is more in a channel, it's more defined. And so there, the Park Service protects the river by designating a boundary, which is the widest of either the 100-year floodplain or the river protection overlay, which in that area is 100 feet on either side. Doesn't that place deference to the development ahead of the policy of protecting and enhancing the river? No, I don't think it does, because it protects the resource that Congress wanted protected when it designated the Merced River, which is the river and its immediate environment. Including El Portal in the statutory designation. Well, when Congress says the only time that Congress in the Act talks about the boundaries is it says the agency shall set boundaries up to or not more than 320 acres per mile, which is one-quarter mile. So it puts an upper bound on what the agency can include in the river corridor, but there's no lower bound. But it does have the general principle that such revisions to the general management plan for the park shall assure that no development or use of park lands shall be undertaken that is inconsistent with the designation of such river segments. Right, and Congress just designates the river, but it leaves it up to the agency to establish the appropriate boundary of how much of the immediate environment, how much of the immediate land should be included in the corridor. And as I say, it adopts an upper bound that allows it to the discretion of the agency to do something less than that. Well, it's discretionary, but that discretion has to be exercised in a manner to enhance and protect ORVs, right? Yes, that's a statutory requirement. Yes, and the Park Service did that here by... A lot of indications that they don't even know where some of these ORVs are, if you read this plan. Well, the Park Service... They can't protect it if you don't know where it is. Park Service made it clear that ORVs, whether they're inside the corridor or outside, will be protected so that if they are found, if a Native American site... How do the boundaries that they select serve to protect it? If you say whether they're inside or outside, the Park Service is going to protect it. One purpose of the boundary is to drown so you protect and enhance the ORVs, right? In fact, that's the primary purpose. It is a purpose, but there's no requirement that the boundaries include all the ORVs, the so-called... Well, the requirement is that the boundaries be drawn as an administrative exercise, right? Right. But if you're saying, well, even if they're outside, we'll protect them so it doesn't matter who draws the boundaries, that's what you're saying. Well, I think Congress recognized that the boundaries are just one device that the agency has, and the agency does not have to draw the boundaries to include all ORVs because the agency has other devices to protect those ORVs and certainly intends to do so.  I think Congress here was trying to balance the fact that Congress has told it that it needs to try and move facilities out of Yosemite Valley. That balancing also, I think, is inconsistent with the Act because the Act says if there are two Acts involved, right, and one could be interpreted to be more lenient, you have to apply the more restrictive Act, in this case the WSRA, which wasn't done. The Park Service relied on the Administrative Site Act to relax the Scenic Rivers Act. Well, I would take issue with the term relax because that assumes that Congress accepted it. That's what you just said. We had to pay attention to the administrative requirements above the requirements of the Wild and Scenic River Act. Well, that provision that you cited does apply where there's a conflict, but I don't think that there is actually a conflict here between the El Portal Act and the Wild and Scenic Rivers Act. There's only a conflict if you assume that Congress said you shall do the full boundaries unless there's some extraordinary circumstance, but that's just not how the statute reads. The way the statute reads on the boundaries is 1274B says the agency, quote, shall, quote, establish detailed boundaries which boundaries shall include an average of not more than 320 acres of land per mile. And that's all that Congress says about that. So it leaves it to the agency's discretion to do less than the 320. And while the agency's choice of a boundary has to be rational, I think in this case it was. The agency didn't choose the minimum. They didn't say, you know, just the high water mark. They said it's the wider of the 100-year flood plain, which is much wider than the high water mark, or the resource protection overlay zone, whichever is greater. So I think the agency did adopt a rational balance there that is permitted. And I think it's also important to keep in mind that for 77 out of the 81 miles that are under the jurisdiction of the National Park Service, the Park Service did adopt the maximum boundary. And I think that, you know, it's somewhat unfair to the Park Service to just carve out this one small piece, which is an area that's quite different from the rest of the park, and say that it was required that it also adopt the maximum boundary. But what was the rationale for the not going to the full extent for El Portal? Well, really two things. The character of the river there, it's a more defined channel there. And then the second is to allow the congressional purpose of being able to site facilities at El Portal. If that's the reason for having El Portal is to be the place where you put facilities. Then isn't that giving primary emphasis to the reason for having El Portal development over your statutory mandate that primary emphasis shall be given to protecting its aesthetic, scenic, historic, archeologic, and scientific features? I don't think so, because the area of El Portal that's outside the boundary is already highly affected. I mean, it's been the area for facilities. The area down by the river that is included in the boundary is the nice, pristine area that falls within the boundaries, and that protects the values that Congress wanted there. But again, if they do find cultural resources or wetlands outside, they will protect. Do the VERP process, or will you tell me that by they? Well, the VERP process will apply, but I mean the Park Service in general, if they find those kinds of resources outside the boundary. Well, why couldn't the Park Service have adopted, given that VERP is this process that won't end until five years or later, why couldn't it have adopted a provisional measure of visitor use now, just at the outset? Because it seems to me the process that's being followed is you're letting degradation occur, and then you're going to move it and do something about it, as opposed to say, no, we're not going to let this degradation occur in the first place, because of course you have to balance what's sustainable, and then let people in little by little, uses in little by little, to determine what maybe your ultimate capacity can be. Well, I think the protection is there in the first place in the plan. They're not going to let degradation occur in the first place because of the restrictive zoning. That's effective. The zoning is the answer. That's effective immediately, plus, as the Park Service says in the plan, it has a lot of other tools at its disposal right now to close areas, like it has closed the Cathedral Beach to take out and so forth. It's got those tools right now before VERP is completed. So it's not a situation where the Park Service is allowing degradation right away. I do want to just briefly talk about the data question. We lodged with the court the three-volume EIS that the Park Service completed for the plan. It is extremely detailed. It relies on literally scores of studies on the biology of the area, the geology of the resources. The cases that the plaintiffs have relied upon, the Oregon Natural Desert Association cases and the National Parks Conservation case involving Glacier Bay, are cases where the agencies relied on environmental assessments, not EISs. This is a case where the agency has done a very thorough EIS. The list of preparers showed that they have about 50 people, experts from different fields working on this. I say there's a lot of data that's been gathered about Yosemite Valley that is used in this plan. So you asked before about other plans, and the two plans that the plaintiffs mentioned in their reply brief, the Gultana River plan and the Upper Rio Grande plan, I think if you look at those, you'll see that they're not nearly as detailed as this one. Those are two plans where it made some sense to follow the numerical limit idea because about the only use you had of those rivers was commercial river rafting. Yosemite is so much more complicated than that. You've got people using the river, canoeing the river, picnicking, hiking and staying overnight and camping. And so the numerical approach that was used in that Gultana plan and the Upper Rio Grande plan simply don't work here. But the information here was very thorough. The plan has been commended as a model by several major national environmental groups, and I think it would perhaps be making, while you might be able to find one or two instances where more data could be gathered, that is always the case. And it's important not to make the perfect the enemy of the good here, and this plan is a very strong one. Unless there are other questions, that's all I have. I just was confused by one thing in your brief. Page 27. You say VERP then provides for the selection of indicators and standards that reflect those desired conditions, monitoring those conditions, standards, implementing management actions, which could include area closure, re-erection of visitors, or heightened restrictions on activities when conditions exceed adopted standards. Now, are you referring there to standards to be adopted in the future? In part, or that could also refer to current standards, say, in the wilderness areas now. So you're referring, but not to existing standards in the plan. That doesn't refer to that. Right. The plan sets out zoning. It's not meant to adopt standards such as the amount of bare ground that is allowable before you close an area. It's a programmatic plan, and I think that's an important point to make. This plan and the general management plan are programmatic. When particular activities are authorized, there will be additional study and NEPA work and so forth, but this plan is meant to be a programmatic one, and therefore adopts the zoning approach rather than specific standards. Thank you. All right. Thank you, Mr. Shulman. Ruben. I just have a few quick points to make following up on what my opposing counsel has said. He first stated that the Park Service hasn't found the use of numbers to be effective, and that statement is contradicted by evidence in the record, where agency experts said that in no instance is the amount of quantity of recreation used specified as required by the Act, and that high visitor use warrants the establishment of use limits. A former hydrologist for the Park Service said that providing visitor services for the ever-increasing numbers of visitors will doom the wild and scenic aspects of the Merced River. The plan needs to set limits on the amount of people and infrastructure that will be allowed in Yosemite Valley, and that's at page 237 of our excerpts of record. So the evidence shows that they do need to get to a number, they need to limit use, or the wild and scenic river's outstandingly remarkable values won't be protected. I'd also like to reiterate that the location of management zones is not based on data. There's nothing in the record that shows that the zoning, the location of where they placed the different zoning, was based on protecting the outstandingly remarkable values. In fact, the zoning, the evidence in the record shows that zoning was placed in different locations primarily to address the kinds of development that the Park Service wanted to do, and the management zonings don't address quantities of use. One agency specialist stated that the lack of data both hinders the ability to undertake a plan at a detailed level and ability to manage the river once the plan is in place, page 111 of our excerpts. I would also just like to briefly address the supplemental authority that my opposing counsel submitted to this court, wilderness society versus U.S. Fish and Wildlife, a recent case that came down, and just to explain that that case is distinguishable because in that case, although the court found that statutory terms were ambiguous and it deferred to the agency, there were no secretarial guidelines interpreting the statute so that four agencies wouldn't administer rivers differently. We have that here. This court has previously found that's the official interpretation of the act, and the novel interpretation that the Park Service suggests here is taken in the context of litigation to defend the plan. And lastly, the plan does not achieve the goals of the Wildland Scenic Rivers Act. The decisions made in it are not rationally connected to evidence before the agency. There's an absence of data, and for all of those reasons, I respectfully request that this court reverse the district court. Thank you. Thank you. We thank both counsel. And this case is submitted for decision.
judges: Goodwin, Tashima, Wardlaw